PHILADELPHIA CONST. CO. v. CRAMP et al.

(Circuit Court of Appeals, Third Circuit.    June 27, 1905.)

No. 12.

CORPORATIONS—BONDS—SALE—UNDERWRITERS' AGREEMENT.

An underwriting syndicate, formed to sell certain bonds for a construction company, agreed that its members should take the bonds in specified proportions, and pay therefor 95 per cent. of their face, with interest, the construction company agreeing to deliver the bonds to the syndicate with certain preferred and common stock of the corporation in consideration of such 95 per cent. of the face value of the bonds. The agreement also provided that the syndicate managers might sell the bonds at not less than their par value and accrued interest, and deduct 10 per cent. of the amount received from actual sales, and pay the same on account of expenses and commissions in the sale, in payment to the construction company of any unpaid portion of the purchase price, and to pay the balance to the members of the syndicate. Thereafter a letter purporting to construe the agreement was written by the syndicate managers reciting that the underwriters were to receive the number of shares of stock set out in the agreement, and in addition 5 per cent. of the par value of the bonds, and that, if the bonds were sold as intended, the underwriters should receive 5 per cent. out of the 10 per cent. reserved from the proceeds of the sale, and, if they should not be sold, that the underwriters should take them at 95 per cent. of the par value. Held, that the original agreement should be construed as requiring that 95 per cent. of the full face value of the bonds should, at all events, be paid to the construction company, and that any unpaid portion of the purchase price should be paid out of the 10 per cent. retained, and that such agreement was not modified by the provisions of the letter.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

See 134 Fed. 690.

F. P. Prichard, for plaintiff in error.

Dwight M. Lowrey, for defendants in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is a writ of error to the Circuit Court of the United States for the Eastern District of Pennsylvania. Suit was brought in the court below upon a statement of claim, of which the following are the material averments:

The Philadelphia Construction Company, plaintiff in error, is a corporation of the state of New Jersey, which, in 1901, under a contract with the Lancaster County Railway & Light Company, for construction of its works, had become possessed of $600,000 of the collateral trust mortgage 50-year, 5 per cent. gold bonds of said last-named company, and of certain shares of preferred and common stock thereof. Being desirous of selling these bonds, the Construction Company entered into an agreement, October 17, 1901, with certain persons, called a "syndicate." The material parts of this agreement, after reciting the foregoing, are as follows:

"1. Each member of the Syndicate for himself only and not for any or either of the other members, hereby agree with the Philadelphia Construction Company and with the other members of the Syndicate to purchase and take and pay for, on April 1, 1903, at ninety-five per cent. of the par value, so much of said $600,000 of said collateral trust mortgage bonds as is set opposite his signature hereto or such proportion thereof as shall not be sold at public or private sale as herein below provided; the Philadelphia Construction Company hereby agreeing to transfer and deliver, as well to or upon the order of each member of the syndicate who shall make payment as herein agreed full paid common stock of the said Lancaster County Railway and Light Company to an amount at par equal to twenty-five per cent. of the par value of said bonds, and also full paid preferred capital stock of said Lancaster County Railway and Light Company to an amount at par equal to twenty per cent. of the par value of said bonds by him agreed to be purchased hereunder.

"2. The members of the syndicate hereby appoint Messrs. Samuel R. Shipley and William B. Given syndicate managers for the purposes and with the powers herein expressed.

"The syndicate managers may at any time on or before April 1, 1903, in their discretion, either personally or through such bank or trust company or banking house as they may elect, offer for sale the said $600,000 of said bonds at not less than their par value and accrued interest, and after deducting from the proceeds of such sale ten per cent. of the amount realized upon the bonds actually sold, which ten per cent. shall be retained by the syndicate managers for the following purposes, to wit:

"(1) For the expenses and commissions paid by the said Syndicate Managers in the sale of said bonds.

"(2) To pay to the Philadelphia Construction Company, or upon its order, any unpaid portion of the purchase price of the bonds subscribed for hereunder by the several members of the syndicate.

"(3) To pay over the balance to the members of the syndicate pro rata in the proportion of their subscription.

"In case the amount of bonds sold as above provided is insufficient to make payment in full of the subscriptions for bonds hereunder made by the members of the syndicate, the same shall be applied on account of such subscriptions and the several members of the syndicate shall and will in such event make payment, to or upon the order of the Philadelphia Construction Company on demand, on April 1, 1903, of the unpaid balance of their subscriptions hereunder, receiving from the Philadelphia Construction Company the unsold bonds by them subscribed for hereunder and as well the common and preferred stock to which they will then be entitled.

"3. The members of the syndicate hereby severally agree that said $600,000 of bonds subscribed for hereunder may, pending the payment of the subscriptions therefor, be pledged by the Philadelphia Construction Company as col-

lateral security for advances to be made; the Philadelphia Construction Company hereby agreeing to repay such advances out of the purchase price of said bonds as and when received from the members of the syndicate or the syndicate managers, or both."

Afterwards, the following letter was issued by Samuel R. Shipley and William B. Given to the underwriters in said syndicate:

"Philadelphia, Pa., November 1, 1901.

"To The Underwriters of the Bonds of the Lancaster County Railway and Light Company.

"In the view that the compensation of the Underwriters is not sufficiently set forth in the underwriting agreement, we desire to say that it is the meaning thereof that the said underwriters shall receive the number of shares of Common and Preferred stock set forth in the agreement, and in addition thereto the sum of Five per cent. (5%) of the par value of the bonds subscribed for in cash at the termination of the underwriting agreement.

"If the bonds shall be sold, as is intended, to other persons than the subscribers to the underwriting, they shall be paid five per cent. (5%) out of the ten per cent. (10%) reserved from the proceeds of the sale; and if they shall not be sold and the underwriters be required to take them at 95, the said five per cent. (5%) of the par value of the bonds shall be paid them in a reduction of the amount paid by them.

"Very truly yours,       Samuel R. Shipley.
"William B. Given.
"Philadelphia Construction Company,
"By John E. Hess, President.

"Attest: Lewis Starr, Secretary."

The syndicate members, some 25 in number, subscribed for the full amount of the bonds. Subsequently, in April, 1902, pursuant to the authorization of the above agreement, the defendant below, the Philadelphia Construction Company, borrowed the sum of $570,000 (being the 95 per cent. of the $600,000 which the syndicate members in the aggregate agreed to pay for the bonds), pledging therefor, as collateral, all the bonds and stock, preferred and common, referred to in said syndicate agreement, and further pledging as collateral the subscriptions contained in the above recited agreement.

By the terms of this agreement, the subscriptions thereto were made payable on or about April 1, 1903. This time was subsequently extended to April 1, 1904. The statement of claim concludes as follows:

"The syndicate managers, in the above-recited syndicate agreement mentioned, did not effect the sale of the said bonds at par to persons other than the syndicate, as contemplated in the said written syndicate agreement; and the plaintiffs and their associates in the syndicate were required to pay, and did pay, on or about the first day of April, 1904, the amount of their several subscriptions, and the plaintiffs particularly paid the sum of $95,000, with interest at five per cent. from January 1, 1904, in conformity with the terms of said syndicate agreement, and released the bonds and stocks aforesaid. The said payment was made by the syndicate to the lenders to an amount in the aggregate of $570,000, that amount being the full subscription price under the syndicate agreement, with interest at five per cent. from January 1, 1904; and the lenders delivered to the syndicate the bonds (with coupons due July 1, 1904, and thereafter attached) and the preferred and common stock above referred to; and the plaintiffs received the bonds and preferred and common stock to which they were entitled upon their subscription, as above recited: but have never received the cash commission of five per cent. upon the par of the bonds to which they are entitled, as hereinbefore recited.

"By reason whereof the plaintiffs aver that the defendant became and is justly indebted to the plaintiffs in the sum of $5,000, with interest from the first day of April, 1904, for which sum demand has been made and refused, wherefore this suit is brought."

The trouble seems to have arisen from the so-called "letter of explanation" of November 1, 1901. The affidavit of defense filed in the case was largely taken up with a statement of reasons why the so-called "supplementary agreement" or "letter of explanation" was in no wise part of the agreement under which the subscription of the syndicate members was made. The court below, in the short opinion preceding its judgment for want of a sufficient affidavit of defense, confined itself to this contention of the affiant.

The argument on the writ of error, however, presents the single question, whether the agreement of October 17, 1901, and the so-called "supplementary agreement" of November 1, 1901, disclosed the existence of any right on the part of the defendants in error and plaintiffs below to receive anything more than the bonds and shares of stock which were delivered. The affidavit of defense may therefore be considered as, in effect, a general demurrer to the statement of claim. The agreement itself seems to us perfectly plain, as to the mutual obligations imposed upon the parties thereto. The syndicate members, in the proportions set down opposite their names, agreed, on or before the 1st of April, 1904, to take the aggregate of $600,000 of the Lancaster County Railway & Light Company bonds, paying therefor 95 per cent. of their face, with interest at 5 per cent. from January 1, 1904. This seems perfectly clear. The construction company agreed to deliver the bonds, with their stock bonus, to the syndicate members, and agreed to take from them 95 per cent. of the face value of said bonds, which, on the other hand, the syndicate members agreed to pay. The form of subscription, below displayed, briefly and with great clearness expresses the true meaning of this contract:

| Name. | Cash Subscribed. | Bonds. | Entitling Preferred Stock. | Subscribed to Common Stock. |
|---|---|---|---|---|
| Cramp, Mitchell & Serrill. | $95,000 | $100,000 | $20,000 | $25,000 |

As above set forth, the agreement then goes on to provide that the syndicate managers may at any time before April 1, 1903 (1904), in their discretion, offer for sale said bonds, at not less than their par value and accrued interest, "and after deducting from the proceeds of such sale ten per cent. of the amount realized from the bonds actually sold, which ten per cent. shall be retained by the syndicate managers for the following purposes, to wit: '(1) For the expenses and commissions paid by the said Syndicate Managers in the sale of said bonds. (2) To pay to the Philadelphia Construction Company, or upon its order, any unpaid portion of the purchase price of the bonds subscribed for hereunder by the several members of the syndicate. (3) To pay over the balance to

the members of the syndicate pro rata in the proportion of their subscription.' "

It does not seem to us that any other meaning can be attached to this provision of the agreement than that the full 95 per cent. of the face value of the bonds was at all events to be paid to the construction company. The "purchase price of the bonds" was undoubtedly 95 per cent. of their par value, and the requirement that "any unpaid portion of the purchase price" should be paid out of the 10 per cent. retained, if the bonds were sold by the syndicate, clearly indicates this meaning. But the bonds were not sold by the underwriters, as contemplated by this provision of the agreement, and it is therefore unnecessary to consider that phase of the matter. The construction company had borrowed $570,000, upon the pledge of these bonds. This fact seems to confirm our opinion as to what was the intention of the parties at the time the agreement was made. It is hardly probable that the construction company, which required that amount to take up these bonds and perfect a delivery, would have been willing to pay $30,000 cash in addition, as is suggested by the defendants in error.

Such being the clearly expressed meaning of the original agreement of October 17, 1901, we turn to the so-called "supplementary agreement" or "explanatory letter." Its first paragraph is plainly in consonance with what we have said was the plain meaning of the agreement; that is, that the underwriters in any event shall, in addition to the bonus of common and preferred stock, receive the sum of 5 per cent. (and no more) of the par value of the bonds subscribed for in cash when the whole business has been concluded. When we come to the second paragraph of this letter, it seems also clear that only 5 per cent. of the par value of the bonds is to be paid to the underwriters; in other words, that the construction company is to receive full 95 per cent. of that value, whether the bonds are sold by the syndicate or are taken by the subscribers thereto. The last clause of that paragraph refers to the situation as it actually occurred. If the bonds were not sold, the underwriters were themselves required to take them at 95, the said 5 per cent. of the par value which was to be paid the underwriters in cash, if the bonds were sold, being now covered by the 5 per cent. reduction from the par value in the price which the syndicate members were obliged to pay for the delivery of the bonds. This letter of November 1st only purports to be an explanation of a preceding agreement, and not to be itself a new agreement. Unfortunately it has served rather to obscure than explain. But, whether the writer was without any clear notion of what its meaning was, or only failed in giving a clear expression of what he intended to say, it seems certain that no meaning can be extracted from its terms sufficiently unequivocal to overthrow the interpretation we have given to the agreement between the parties.

The judgment of the court below must therefore be reversed.